**Ninfa Perez ORTIZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–87–00362–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 9, 1989.

Discretionary Review Granted (Appellant) Feb. 28, 1990.

Discretionary Review Granted (State) Feb. 28, 1990.

Brian W. Wice, Houston, for appellant.

Michael J. Guarino, Crim. Dist. Atty., Mark Kelly, and Susan W. Burris, Asst. Crim. Dist. Attys., Galveston, for appellee.

Before EVANS, C.J., and O'CONNOR and DUGGAN, JJ.

O'CONNOR, Justice.

A jury convicted appellant, Ninfa Perez Ortiz, of attempted murder, found she used a deadly weapon in the commission of the offense, and assessed punishment at eight years confinement. Appellant asserts seven points of error. Only the first and second points of error are published.

Appellant had a difficult marriage to Richard Ortiz. They divorced in 1983, and dated other people. Appellant became intensely jealous of a woman Richard was seeing. Appellant tried to commit suicide by swallowing two bottles of medicine.

Richard first met Wayne Messinger when he called Richard to tell him appellant had tried to kill herself. Messinger told Richard he wanted to marry appellant and asked Richard to stay away from her. Richard went to see appellant and, in June of 1984, they decided to live together again. Things were not completely settled, but Richard believed they were getting along.

In the evening of February 2, 1985, appellant insisted that Richard take her to a store at the shopping mall. While they were in the parking lot, someone shot Richard in the head. At the hospital, appellant opined that it was just somebody passing by, and the police confirmed it happened all the time in that area.

Five months later, on June 14, 1985, Richard left work early and went home to change clothes. Their house was open, and the air conditioner was on, which struck him as strange. He thought the children were home, but they did not come when he called for them. As Richard was coming down the stairs, he saw a man step over the sofa, crouch behind it in the firing position, and shoot him. Again and again, the man shot Richard. After he used most of his bullets, the two engaged in hand to hand combat. Richard was at a distinct disadvantage because he had been shot in one shoulder, which made one arm useless, and he had been shot in the other wrist. As Richard struggled with the intruder, he felt something slip off the intruder's face and noticed for the first time that the man was wearing a mask. When the mask came off, Richard realized it was Messinger, his wife's boyfriend, who was the dispatcher for the Galveston Police. Richard was finally able to lunge at Messinger and knock him into a window, which caused some noise. Messinger ran out of the house. Richard dialed 911 (using his tongue) and retreated upstairs into a bedroom and locked the door (using his knee). Richard received seven gunshot wounds: in the stomach, the side, the head, the neck,

the shoulder, the leg, and in the wrist. Richard spent 17 days in intensive care.

Messinger shot Richard with a semi-automatic .22 pistol equipped with a silencer. The clip holds 12 rounds. Clifford Amason, a gun dealer, testified that he first met Messinger at a gun show in August 1984. Messinger later called Amason and told him that he wanted to buy a .22 pistol and a silencer. In order to purchase a silencer, Messinger had to fill out an application. Amason completed the application and sent it to the Alcohol, Tobacco, & Firearms Bureau (ATF). That form was dated March 11, 1985. Amason delivered the gun and silencer to Messinger on June 11, 1985. Richard Ortiz was shot on June 14, 1985.

On June 17, 1985, appellant turned herself in to the district attorney and volunteered to make a statement. She asked that Richard's parents and Messinger be present. Appellant made the following statements:

Richard and I had had an argument the night before. [February 1, 1985] Richard had beaten me and I then called Wayne Messinger, a Galveston Police Officer. I told Wayne to kill Richard. I told Wayne that we would go to Toys–R–Us and for him to shoot Richard there.

Richard and I went into the store and did some shopping. We then got back into the car and Richard was shot in the back of the head, but was not killed.

I later was angry with Wayne because he had not killed Richard. Wayne had showed me a rifle with a scope that I believe he had used in the shooting of my husband, Richard Ortiz. . . .

\*    \*    \*    \*    \*    \*

On Thursday, June 13, 1985 my husband, Richard Ortiz, and I had an argument. Richard had found a credit card in my purse. This credit card belonged to Wayne Messinger. As a result of this my husband beat me and called me all types of names. Richard told me that he was going to leave me. During this argument Richard got a gun. We fought over this gun and I was able to take the gun away from Richard. I took this gun and another that we had in the house and

put them inside the car. I did this to protect myself and so that he wouldn't have them.

The next day I tried getting in touch with Wayne Messinger, a Galveston Police Officer. I was unable to reach him. I later was able to contact him and I told him of the beating that Richard had given me.

I told Wayne that I wanted to kill Richard. Wayne told me that he loved me and that he would do anything I asked. I told Wayne that if he didn't kill Richard, that I would. I gave Wayne a description of our house and also the times that my husband Richard would be at the house by himself.

At twelve noon I took my lunch break and went to my house in Texas City. I got all of Richard's clothes and put them in my car. I wanted to make it seem as if Richard had left me. I called Wayne again and asked him if he was going to do it. I told him that if he didn't do it that I would. I left the doors open to my house so that Wayne could come over and wait for Richard to get home.

Later that afternoon Linda Johnston called me into her office to advise me that my husband had been shot. I was taken to Danforth Hospital by John Manuel. About a week to ten days before this shooting, I was aware that Wayne Messinger had gotten a silencer for a pistol so that my husband could be shot without making too much noise. This was done at my request.

After she made her statements, the officers arrested appellant.

Dr. Toby Myers, a psychotherapist, testified she saw appellant several times from December 1985 through September 1986. She diagnosed appellant as a battered woman and testified about the typical behavior of battered women. Dr. Myers testified that appellant disliked being beaten by Richard, and that she would do anything to avoid it.

The defense introduced the testimony of several witnesses, who saw marks and bruises on appellant at different times from 1975 to the date of the offense. Dr.

Paul Fine examined appellant on June 17, 1985, and found no evidence of a physical assault.

## I. THE DEADLY WEAPON FINDING.

In her first point of error, appellant challenges the trial court's refusal to delete the jury's finding that she used a deadly weapon in the commission of the offense. In its brief, the State concedes the judgment in this case should be reformed to delete any finding that appellant used a deadly weapon, in accord with *Travelstead v. State,* 693 S.W.2d 400 (Tex.Crim.App. 1985).

The Texas Code of Criminal Procedure provides:

> Upon affirmative finding that the defendant used or exhibited a deadly weapon during the commission of an offense or during immediate flight therefrom, the trial court shall enter the finding in the judgment of the court.

Tex.Code Crim.P.Ann. art. 42.12, sec. 3g(a)(2) (Vernon Supp.1989).

The jury convicted appellant as a party to the offense. The evidence showed that her co-defendant, Wayne Messinger, actually held the deadly weapon used in the commission of the offense. *Travelstead* requires the jury to find that the defendant, not another party, used the deadly weapon to support a deadly weapon finding. *Travelstead,* 693 S.W.2d at 402.

Accordingly, we sustain appellant's first point of error and order the judgment reformed to delete this finding. This ruling does not change appellant's conviction or punishment.

## II. DR. GRIPON'S TESTIMONY.

At the punishment stage of trial, the State re-offered all of the evidence from the guilt phase, and the testimony of Dr. Gripon, a psychiatrist. After testifying at length about the characteristics of a victim of abuse, Dr. Gripon stated his opinion that appellant did not fit the profile of a battered wife. He also concluded that appellant was not a good candidate for probation.

In her second point of error, appellant claims the trial court should not have permitted Dr. Gripon to testify as an expert about appellant's suitability for probation.

Appellant introduced the testimony of several witnesses that she had a good reputation for being a law-abiding citizen and would be a good candidate for probation. Her witnesses included the victim of the crime, friends, relatives, and former and current employers. Appellant also testified on her own behalf.

Appellant cites *Schulz v. State,* 446 S.W.2d 872 (Tex.Crim.App.1969), and its progeny, in support of her argument that Dr. Gripon's testimony was not admissible. In *Schulz,* the trial court refused to permit a psychiatrist to testify that probation was better for the defendant than confinement. In affirming the action of the trial court, the court stated:

> If such testimony is allowed, the State would be justified in seeking to put on an expert, perhaps a sociologist or penalogist [sic] to prove that it would be better for the defendant to serve time in a penal institution. Then further testimony would no doubt be offered by both sides on the relative values of probation compared to confinement.

*Schulz,* 446 S.W.2d at 874. The court held such testimony invades the province of the jury. *Id.* In *Logan v. State,* 455 S.W.2d 267 (Tex.Crim.App.1970), defendant offered testimony of a probation officer concerning the primary requirement of an applicant for probation and the purpose of probation. The Court of Criminal Appeals treated the proffered testimony as similar to that of the psychiatrist in *Schulz* and held the trial court did not err in excluding it. *Id.* at 270.

In *Tollett v. State,* 727 S.W.2d 714, 719 (Tex.App.—Austin 1987), *vacated on other grounds,* 761 S.W.2d 376 (Tex.Crim.App.

1988), the trial court excluded testimony from three expert witnesses, to the effect that probation for the defendant (instead of imprisonment) would promote the successful treatment of his children, whom he had sexually molested. The appellate court affirmed, saying the effect of probation on the victim of the crime is irrelevant. 727 S.W.2d at 720.

Although the Texas Court of Criminal Appeals repudiated the "invasion of the province of the jury" rule in *Hopkins v. State,* 480 S.W.2d 212, 218 (Tex.Crim.App. 1972), two Texas courts of appeals have later cited *Schulz* in similar cases. *Whitton v. State,* 711 S.W.2d 129, 131 (Tex.App. —Eastland 1986), *pet. ref'd per curiam,* 730 S.W.2d 754 (Tex.Crim.App.1987); *Clemmons v. State,* 638 S.W.2d 657, 659 (Tex.App.—Fort Worth 1982, no pet.). In both cases, the defendant tried to introduce the testimony of an expert that probation provided better chances for rehabilitation than confinement. Both courts expressed concern that the admission of such testimony opened the court for a "battle of experts" and a debate about the effectiveness of our criminal justice system. They also pointed to "more traditional" means available to the defendant to show his or her amenability to probation, for example, the testimony of family and friends. *Whitton,* 711 S.W.2d at 131–32; *Clemmons,* 638 S.W.2d at 659; *see also Parra Gonzales v. State,* 756 S.W.2d 413, 417 (Tex.App.—El Paso 1988, pet. ref'd); *contra Wilkerson v. State,* 766 S.W.2d 795, 799–800 (Tex.App.— Tyler 1987, pet. ref'd).

The Texas Court of Criminal Appeals ruled that a trial court correctly excluded the testimony of a probation officer about the possible terms and conditions of probation in *Brown v. State,* 741 S.W.2d 453, 455 (Tex.Crim.App.1987). In making its holding, the court stated:

The logical and inevitable result of this would be to allow an escalating 'battle of the experts' to develop during the pun-

ishment phase of the trial. *Whatever probative value this testimony would have is far outweighed by the danger that it would prejudice or confuse the trier of fact.*

*Brown,* 741 S.W.2d at 455 (emphasis added).

In *Dunnington v. State,* 740 S.W.2d 896, 898 (Tex.App.—El Paso 1987, pet. ref'd), the court noted:

[T]he use of expert testimony presents a risk of overbearing the jury in its deliberative responsibility. The disparate expertise of the witness and the average juror tends to produce a natural inclination to accept the expert testimony as gospel. Such inclination is magnified by the natural disinclination of the average juror to sit in judgment of another, to include assessment of punishment. To avoid, or at least minimize these effects, the use of expert testimony is restricted to those situations in which the expert's knowledge and experience on a relevant issue are beyond that of the average juror. The decision is still the jury's, but the testimonial expertise is provided to enable it to better comprehend the full significance of the evidence. The use of expert testimony in any other situation can overbear the jury and tantalize its inclination to defer its responsibility. Whatever the reason, such practice strikes at the very core of our criminal justice fact-finding process.

The arguments voiced in these opinions suggest the State's expert evidence should have been excluded as prejudicial under Tex.R.Crim.Evid. 403.

We hold it was error for the trial court to permit the State to present an expert to testify that appellant was not a suitable candidate for probation. The next question for us is whether the error was harmful under Tex.R.App.P. 81(b)(2). To answer that question we must review all the evidence in the case. After reviewing all the

evidence, we cannot say that the error was harmless. We therefore sustain this point of error.

We reform the judgment to delete the "deadly weapon" finding. We also reverse this case for retrial of the punishment phase of the trial, because Dr. Gripon's testimony should have been excluded.

The discussion of the remaining points of error does not meet the criteria for publication, Tex.R.App.P. 90, and is thus ordered not published.